# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CLAUDE E. MICHALSKI**
    **Plaintiff,**

    v.                                                                    Case No. 16-C-1590

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
    **Defendant.**

## DECISION AND ORDER

Plaintiff Claude Michalski applied for social security disability benefits, alleging that he could not work due to neck and back pain, depression/anxiety, and sleep apnea. The Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff's impairments, while severe, did not prevent him from performing his past work as a surveillance monitor at a casino. In this action for judicial review, plaintiff primarily argues that the ALJ erred in finding that he could still do this job.[1] Because the basis for the ALJ's finding on this point is unclear, I must remand the matter for further proceedings.

## I. STANDARDS OF REVIEW

### A. Disability Standard

The ALJ applies a five-step, sequential test for determining disability, asking:

(1) Is the claimant currently working, i.e., engaging in "substantial gainful activity" ("SGA")?

---

[1] Plaintiff also contends that the ALJ erred in discounting the opinion of his treating physician and in failing to account for his solid work record in evaluating the credibility of his assertions.

(2) If not, does the claimant suffer from any "severe" impairments?

(3) If so, do any of those impairments meet or medically equal the requirements of one of the conclusively disabling impairments listed in the regulations (the "Listings")?

(4) If not, does the claimant have the residual functional capacity ("RFC") to return to his past relevant work,[2] either as he actually did it or as it is generally performed in the economy?

(5) If not, can he can make the adjustment to other work in the national economy?

See 20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of presenting evidence at steps one through four, but if he reaches step five the burden shifts to the agency to show that the claimant can make the adjustment to other work. The agency may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education, and work experience.[3] See, e.g., Neave v. Astrue, 507 F. Supp. 2d 948, 953 (E.D. Wis. 2007).

**B.	Judicial Review**

The court reviews an ALJ's decision to determine whether it applies the correct legal standards and is supported by substantial evidence. Summers v. Berryhill, 864 F.3d 523, 526 (7th Cir. 2017). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. While the court may not, under this

---

[2]Past relevant work is defined as work that the claimant performed within the previous 15 years, that qualified as substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1).

[3]The ALJ may also rely on VE testimony in evaluating the claimant's ability to perform past work at step four. See, e.g., Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003).

2

deferential standard, re-weigh the evidence or substitute its judgment for the ALJ's, id., the court will nevertheless conduct a critical review, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision; the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. Scrogham v. Colvin, 765 F.3d 685, 695 (7th Cir. 2014). The court limits its review to the reasons supplied by the ALJ in his decision; the Commissioner's lawyers cannot bolster a deficient decision on appeal. See, e.g., Meuser v. Colvin, 838 F.3d 905, 911 (7th Cir. 2016).

## II. BACKGROUND

### A. Plaintiff's Application/Supporting Materials and Agency Decisions

Plaintiff applied for benefits on October 12, 2012, alleging a disability onset date of April 1, 2011. (Tr. at 199.) He reported past work as a service technician for AT&T/Digital Electronic Group from 2001 to March 31, 2011, which required him to be on his feet most of the day and lift 80+ pounds. He also worked as a surveillance monitor at a casino from 1997-2000, which required walking/standing about one hour and sitting seven hours, and lifting up to 20 pounds. This job also involved the use machines, tools or equipment; technical knowledge or skills; and the completion of reports. (Tr. at 217, 229, 238, 241.)

In a function report, plaintiff indicated that he experienced constant back pain, lack of sleep, depression, and anxiety. (Tr. at 245.) He wrote that his impairments interfered with personal care, such as dressing and using the toilet. (Tr. at 246.) He further indicated that he socialized little and spent his time watching TV and listening to the radio. (tr. at 249.) He stated that he could not lift more than five pounds, walk 1/4 mile before experiencing back pain, and had to alternate standing and sitting. He further indicated that he could pay attention for

3

about 10 minutes and did not follow written or spoken instructions or handle stress or changes in routine well. (Tr. at 250-51.) In a physical activities addendum, plaintiff wrote that he slept five to six hours per night, reduced due to racing thoughts, tingling and numbness in his arms and hands, and back pain. He could continuously sit for ½ hour, stand for ½ hour, and walk for 15 minutes; in a day, he could sit for three hours, stand for three hours, and walk for 15 minutes. His doctor had limited him to lifting 10 pounds. (Tr. at 253.)

The agency sent plaintiff for a psychological evaluation, completed by Jeremy Meyers, Ed.D., on March 18, 2013. (Tr. at 474.) Dr. Meyers diagnosed mood disorder, depression, anxiety disorder, and alcohol dependence in short-term remission, with a GAF of 48.[4] (Tr. at 477-78.) He concluded:

> Mr. Claude Michalski should be able to understand and remember simple instructions, but being able to carry them out may be difficult because of his physical condition. He should be able to respond appropriately to supervisors and coworkers and maintaining concentration and attention should be manageable. He may have difficulty meeting work pace demands again because of [a] combination of his weight and orthopedic pain. Withstanding anything more than routine work stress will test his ability to cope, but he should be able to respond to any job site changes he would find in most semi-skilled work environments.

(Tr. at 478.)

The agency denied the application initially on April 23, 2013, relying in the reports of George Walcott, M.D., and Roger Rattan, Ph.D., who on review of the record concluded that

---

[4]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and his overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 51-60 denote "moderate" symptoms and 41-50 "severe" symptoms. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000). In the Fifth Edition of the DSM, published in 2013, the American Psychiatric Association eliminated use of the GAF, citing a "conceptual lack of clarity." Lanigan v. Berryhill, 865 F.3d 558, n.1 (7th Cir. 2017).

4

plaintiff could perform unskilled, light work. (Tr. at 101-13, 137.) Plaintiff requested reconsideration (Tr. at 143), but on November 19, 2013, the agency maintained the denial based on the review of James Greco, M.D., who found plaintiff capable of light work with certain additional postural, manipulative, and environmental limitations, and Ellen Rozenfield, Psy.D., who found that plaintiff could perform simple, routine tasks on a sustained basis in a work setting with only occasional workplace changes. (Tr. at 114-31, 144.)

Plaintiff then requested a hearing before an ALJ. (Tr. at 150.) Prior to the hearing, he submitted a report from his primary physician, Dr. Timothy Grass, who listed a diagnosis of cervical and lumbar disc disease, with a poor prognosis. Dr. Grass indicated that plaintiff experienced pain that constantly interfered with the attention and concentration needed to perform simple work-related tasks. He further opined that plaintiff could, in an eight-hour workday, sit for one hour, stand for one hour, and walk for one hour. (Tr. at 551.) Dr. Grass also endorsed significant limitations in simple grasping, pushing/pulling, and fine manipulation. Plaintiff could lift 0-5 pounds 20% of the day, 5-10 pounds 10% of the day, and 11-20 pounds 5% of the day (Tr. at 552); could bend 10% of the day, squat 5% of the day, crawl 5% of the day, never climb, and reach 5% of the day (Tr. at 553). He also needed to avoid all exposure to unprotected heights and moderate exposure to other hazards and environmental irritants. Finally, he would require unscheduled breaks during the workday. (Tr. at 553.)

**B.     Hearing**

On May 21, 2015, plaintiff appeared with counsel for his hearing before the ALJ. The ALJ also summoned a VE. (Tr. at 49.)

### 1. Plaintiff

Plaintiff testified that he was 6 feet tall, 275 pounds, and lived in an apartment with his wife. (Tr. at 54-55.) He had a high school diploma with some additional education in the military. (Tr. at 55-56.) Plaintiff testified that from 2001 to 2011 he worked for AT&T/Digital Electronic Group performing maintenance on outside lines, working inside homes and businesses, troubleshooting problems and installing new lines (Tr. at 58-59), which involved climbing and lifting a ladder weighing 80 pounds (Tr. at 60, 84). He was terminated from this job due to attendance (Tr. at 60), missing days because of his back and neck (Tr. at 84). Prior to that, plaintiff worked doing surveillance for a casino, which involved working "inside the office, keeping an eye on the people and at times working the floor, walking a lot . . . looking for trouble or cheaters." (Tr. at 59.) He was terminated from this position at some point in 2000.[5] (Tr. at 97.)

Plaintiff testified that he could no longer work because of back pain, difficulty sleeping due to numbness and sleep apnea, and neck stiffness. (Tr. at 61.) He indicated that he had to change positions after about ½ hour due to pain and numbness. (Tr. at 62.) He also experienced worsening pain after walking for about 15 minutes. (Tr. at 62-63.) To relieve the pain, he used a TENS machine, ice, and muscle relaxers. (Tr. at 63.) He had been on Oxycodone, but it stopped working. (Tr. at 64.) He had also received cortisone injections and nerve blocks, with temporary relief. (Tr. at 66, 81.) The muscle relaxer seemed to be helping. (Tr. at 66.) He was also taking medications for depression. (Tr. at 67.) His doctors had

---

[5]Plaintiff's counsel noted that, depending on the date plaintiff left this job in 2000, it could fall outside the 15 year period for past relevant work. (Tr. at 97.) The ALJ gave counsel two weeks to file a brief addressing the issue (Tr. at 98-100), but nothing was filed (Tr. at 37).

6

recommended exercise, but he could not do it. (Tr. at 68.) He testified that some days he could lift about 40 pounds, like when he was bringing in the groceries; on other days, his wife would bring them in. (Tr. at 74.) He could sit and stand for about ½ hour. (Tr. at 76.) He did some cleaning and dish washing, but his wife did the laundry and grocery shopping. (Tr. at 79.)

**2.    VE**

The VE classified plaintiff's past jobs as "cable television technician" (heavy, SVP 6)[6] and "surveillance systems monitor" (sedentary generally, light as plaintiff described it, SVP 2). (Tr. at 88, 90, 94.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, limited to light work, with frequent climbing of ramps and stairs but no climbing of ladders, ropes, or scaffolds; frequent balancing; occasional stooping, kneeling, crouching, and crawling; and frequent reaching. (Tr. at 88.) The VE testified that such a person could not perform plaintiff's past technician job but could do the surveillance monitor job, as well as various other jobs such as cashier, checker, and retail sales attendant. (Tr. at 88-89.) Adding a limitation of no exposure to chemicals or unprotected heights, the past technician job could not be done but the monitor job could be done, as could the other identified jobs. (Tr. at 90-91.) Adding a limitation of simple, routine, and repetitive tasks, a work environment free of past-paced production requirements, involving only simple

---

[6]Specific Vocational Preparation ("SVP"), as defined in the Dictionary of Occupational Titles, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. https://www.onetonline.org/help/online/svp. Jobs with an SVP of 1 (meaning they can be learned with a short demonstration only) and 2 (anything beyond a short demonstration up to and including 1 month) correspond with "unskilled" work. Jobs with an SVP of 3 (over 1 month up to and including 3 months) and 4 (over 3 months up to and including 6 months) are considered "semi-skilled." Jobs with an SVP of 5-9 are considered "skilled" work. SSR 00-4p, 2000 SSR LEXIS 8, at *8.

7

work-related decisions and few, if any, workplace changes, the person could still do the surveillance monitor job, as well as the other jobs. (Tr. at 91.) The VE further explained that a person could be off-task up to 10% of the workday, but more than that would result in termination. (Tr. at 91.) If the person were limited to sedentary work, the surveillance monitor job could still be done; the person could also work as an order clerk and machine tender. (Tr. at 92.) The VE testified that there would be no transferrable skills from plaintiff's past surveillance job to other jobs; there could be some transferrable skills from the technician job but not to any of the jobs the VE had identified. (Tr. at 93.)

**C.    ALJ's Decision**

On June 24, 2015, the ALJ issued an unfavorable decision. (Tr. at 27.) Following the sequential evaluation process, the ALJ determined that plaintiff had not engaged in substantial gainful activity since April 1, 2011, the alleged onset date, and that he suffered from the severe impairments of degenerative disc disease of the cervical and lumbar spine, obesity, obstructive sleep apnea, depression, and anxiety, none of which met or equaled Listing. (Tr. at 32-35.)

The ALJ then determined that plaintiff retained the RFC for light work with additional non-exertional limitations: frequent climbing of ramps and stairs but no climbing of ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, or crawling; frequent bilateral overhead, straight-forward, and fully extended reaching; no exposure to chemicals or unprotected heights; simple, routine, repetitive tasks only in a work environment free of past-paced production requirements and involving only simple work-related decisions and few, if any, workplace changes; and allowing him to be off-task up to 10% of the workday. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 35.)

8

The ALJ noted that plaintiff's primary complaint was chronic back pain, which prevented him from sleeping well and caused numbness in his hands and neck stiffness. Plaintiff stated that he lost previous jobs because he missed too much work due to his ailments. (Tr. at 35.) The ALJ found that plaintiff's impairments could cause the symptoms alleged, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms "are not entirely credible for the reasons explained in this decision." (Tr. at 36.)

The ALJ reviewed some of the medical evidence, including a lumbar MRI showing two bulging discs but no nerve root impingement. Plaintiff also complained of cervical problems, but the ALJ indicated that the record contained no objective findings demonstrating the cause of plaintiff's neck pain. Plaintiff received pain management treatment, including medications, injections, physical therapy, and chiropractic treatment, which appeared to reduce his pain level. Plaintiff's primary physician, Dr. Grass, recommended that plaintiff exercise and lose weight. (Tr. at 36.)

The ALJ considered Dr. Grass's report indicating that plaintiff could occasionally lift up to 20 pounds but could sit only one hour, stand one hour, and walk one hour in an eight-hour workday. The ALJ gave this opinion limited weight, "as it appear[ed] to be based solely on [plaintiff's] subjective complaints and is not supported by the medical evidence[.]" (Tr. at 36.) The ALJ noted that the objective evidence was "relatively mild and show[ed] no neurological involvement." (Tr. at 36.) Further, plaintiff's response to treatment had been generally good, with a reduction in pain. Finally, the ALJ found Dr. Grass's recommendation that plaintiff exercise to relieve back pain inconsistent with an opinion that plaintiff could only sit, stand, or walk three hours per day. (Tr. at 36.) The ALJ instead gave significant weight to the opinions of the agency consultants, who concluded that plaintiff could perform light work with some non-

9

exertional limitations. (Tr. at 36.)

Plaintiff testified that his pain was so severe that he could only walk 15 minutes and stand or sit for about 30 minutes before having to change position. However, the ALJ determined that "the treatment records indicate [plaintiff's] condition is not that severe. The records note good responses to treatment on several occasions and considering the paucity of objective findings the undersigned finds this testimony only partially credible." (Tr. at 36.) The ALJ acknowledged that plaintiff suffered "from some level of back pain. However, based on all the evidence as a whole the undersigned finds that [plaintiff] can perform the exertional requirements of light work with several nonexertional limitations." (Tr. at 37.)

The ALJ accounted for plaintiff's back pain by limiting climbing and postural movements; his cervical issues by limiting reaching; and the potential for somnolence due to sleep apnea by avoiding exposure to unprotected heights. (Tr. at 37.) The ALJ further determined that plaintiff's history of alcoholism, depression, and mild anxiety would interfere with his ability to perform more than simple, routine, and repetitive work, as noted by Dr. Meyers. Based on his combination of mental impairments, the ALJ limited plaintiff to simple, routine, repetitive tasks in a work environment free of past-paced production requirements and which involves only simple work-related decisions and few, if any, workplace changes. Finally, because of a combination of all of his impairments, plaintiff had to be allowed to be off-task up to 10% of the workday. (Tr. at 37.)

In light of this RFC, and relying on the testimony of the VE, the ALJ concluded that plaintiff was capable of performing his past relevant work in a casino. The VE identified this job as a surveillance system monitor and testified that someone with plaintiff's characteristics could perform it. (Tr. at 37.) The ALJ accordingly found plaintiff not disabled. (Tr. at 37-38.)

On September 28, 2016, the Appeals Council denied review. (Tr. at 1.) This action followed.

### III. DISCUSSION

**A.    Step Four Determination**

As indicated above, if the claimant's RFC allows him to perform his past relevant work, either as he actually did it or as it is generally done in the economy, he will be found not disabled. See Getch v. Astrue, 539 F.3d 473, 482 (7th Cir. 2008); Arbogast v. Bowen, 860 F.2d 1400, 1403 (7th Cir. 1988). In considering a job as actually performed, the ALJ may not describe the work in a generic way, e.g., "sedentary" or "light," and then conclude, on the basis of the claimant's RFC, that he can return to his previous work. See Tenhove v. Colvin, 927 F. Supp. 2d 557, 569 (E.D. Wis. 2013) (citing SSR 96-8p). "Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." Nolen v. Sullivan, 939 F.2d 516, 518 (7th Cir. 1991) (citing Strittmatter v. Schweiker, 729 F.2d 507, 509 (7th Cir. 1984)); see also Smith v. Barnhart, 388 F.3d 251, 252-53 (7th Cir. 2004).

In determining whether the claimant can perform a job as it is usually done, the ALJ may be able to rely on a generic job description in the Dictionary of Occupational Titles ("DOT"). See SSR 82-61, 1982 SSR LEXIS 31, at *3-4. There are instances, however, in which the claimant's job has no precise counterpart in the DOT; for example, so-called "composite jobs" have significant elements of two or more occupations listed in the DOT. Id. at *5.

> Such situations will be evaluated according to the particular facts of each individual case. For those instances where available documentation and vocational resource material are not sufficient to determine how a particular job is usually performed, it may be necessary to utilize the services of a vocational

11

specialist or vocational expert.

Id.; see also Wiggins v. Colvin, No. 12 CV 9384, 2015 U.S. Dist. LEXIS 64254, at *17 (N.D. Ill. May 18, 2015) ("Because by definition a composite job will have no DOT counterpart, the ALJ may rely on evidence provided by a VE to explain the nature of the claimant's past relevant work.").

When confronted with such a situation, the ALJ cannot simply take a composite job, divide it into its two component jobs, and find that the claimant can return to the less strenuous of the two. See Wiggins, 2015 U.S. Dist. LEXIS 64254, at *20; see also Combs v. Berryhill, No. 16-cv-02386, 2017 U.S. Dist. LEXIS 98104, at *15 (S.D. Ind. June 26, 2017) (explaining that the ALJ may not find a claimant capable of performing past relevant work on the basis that he can meet some of the demands of a composite job, but not all of them). Nor may the ALJ rely on VE testimony that is based only on the DOT as a source of information, for that is no different than relying on the DOT itself. See Wiggins, 2015 U.S. Dist. LEXIS 64254, at *17 (citing Lipke v. Astrue, 575 F. Supp. 2d 970, 983 (W.D. Wis. 2007)). Instead, as the agency's Program Operations Manual ("POMS") explains, because a composite job does not have a DOT counterpart, the ALJ will not evaluate it at the part of step four considering work "as generally performed." And, when comparing the claimant's RFC to a composite job as the claimant performed it, the ALJ will find the claimant capable of performing the composite job only if he can perform all parts of that job. See Cheatham v. Berryhill, No. 15-cv-1382, 2017 U.S. Dist. LEXIS 19239, at *18 (S.D. Ill. Feb. 10, 2017) (citing POMS DI 25005.020).

In the present case, ALJ stated:

[Plaintiff] testified that he work[ed] as a surveillance monitor (light, unskilled) in a casino in the past. The vocational expert identified that as a surveillance system monitor. . . . Because [plaintiff] worked as a system surveillance monitor,

12

> within the past 15 years and earned income at SGA levels the undersigned finds it is past relevant work.
>
> In comparing [plaintiff's] residual functional capacity with the physical and mental demands of this work, the undersigned finds that [plaintiff] is able to perform it as actually and generally performed. The vocational expert testified that someone with [plaintiff's] age, education and residual functional capacity could perform the occupation of system surveillance monitor.

(Tr. at 37.) Because the ALJ relied on the VE's testimony (rather than some other record evidence describing plaintiff's casino job), I must determine whether that testimony constitutes substantial evidence supporting the ALJ's step four determination that plaintiff could do this past job, as actually or generally performed.[7]

The VE initially testified that the casino job would be "described as a surveillance systems monitor, DOT 379.367-010. That's classified as light work. The SVP is 2." (Tr. at 88.) After responding to the ALJ's first hypothetical, the VE corrected himself, indicating that this job is "sedentary according to the DOT." (Tr. at 90.)

The VE did not say why he selected DOT code 379.367-010 to describe plaintiff's casino job. The DOT explains that a "surveillance-system monitor":

> Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity.

---

[7]As indicated above, at the hearing, plaintiff testified that this job involved working "inside the office, keeping an eye on the people and at times working the floor, walking a lot. You know, we did both surveillance and towards the end walking the floors, looking for trouble or cheaters." (Tr. at 59.) In a pre-hearing submission, plaintiff wrote that the job required walking/standing about one hour and sitting seven hours, and lifting up to 20 pounds; it also involved the use of machines, tools or equipment, and technical knowledge or skills, as well as writing reports. (Tr. at 241.) The ALJ did not rely on this evidence in making his step four determination.

13

> Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.[8]

The VE did not mention DOT code 343.367-014 ("gambling monitor"), which appears to be a better fit. In this position, the employee:

> Observes patrons and employees participating in gambling activities to detect infractions of house rules: Watches participants in games such as dice or cards to detect cheating, identify rule violators, and observe persons designated by superior. Speaks or signals to supervising personnel using hand, telephone, or voice to identify and supply information about suspected violators. May examine dice periodically to check for damage or substitution. May calculate winnings to verify payment made by dealer.

The DOT classifies this job as light, with an SVP of 7, making it skilled work.[9]

On questioning by plaintiff's counsel, the VE confirmed that the surveillance monitor job he identified was sedentary according to the DOT, but that plaintiff described his job as light. (Tr. at 94.) The VE acknowledged that there are jobs, in the gaming industry for instance, in which the person walks around doing internal surveillance, but he indicated that there are also casino employees who do the surveillance electronically, as DOT 379.367-010 contemplates. (Tr. at 94.) Counsel then pointed out that the DOT code the VE cited pertained to a government job in a transit terminal. (Tr. at 94.) The VE responded that "comparable" jobs could be done in other places, such as casinos, in the same sedentary fashion referenced in the DOT. (Tr. at 95.) The VE admitted that he did not know how many such private sector jobs existed but estimated that, given the number of casinos in Wisconsin, "there are probably hundreds, if not thousands, of those kinds of jobs as well." (Tr. at 95.) The VE continued:

---

[8] https://occupationalinfo.org/37/379367010.html. According to the DOT, this is a sedentary job with an SVP of 2, as the VE said. Id.

[9] https://occupationalinfo.org/34/343367014.html

14

> I've observed those jobs, both having been in casinos. I've also been, I'm not in security and casinos, but only talking, talking to people in this business is part of my business, who have worked as security people or surveillance people and described that they probably would have, depending on the size of the casino, anywhere from 2 to 20 people in that casino. They may also have in a series of casinos connected together, they may have, you know, multiples of that. So, you know, you're talking about, you now, 4 or 500 people would not be unusual to have a casino network with that kind of connectivity and that kind of numbers of people doing in a sedentary fashion.

(Tr. at 96.)

After some back and forth regarding whether plaintiff did the casino job within the 15-year period, the ALJ asked the VE:

> Q    My final question to you, sir, is I take it that this monitoring job, the security monitoring job, is based on your experience and your knowledge and not the DOT?
>
> A    No. The numbers I provide is based on the DOT.
>
> Q    Numbers in the DOT?
>
> A    And the Department – well, the numbers are based on Department of Labor Bureau of Labor Statistics, not on me. I mean that's numbers I take from their, from their information. I don't come up with those numbers.
>
> Q    Okay. So is your testimony in all the cases according to the DOT or other resources?
>
> A    Yes, oh, yes.

(Tr. at 98-99.)

I cannot uphold the ALJ's decision on this record. See Britton v. Astrue, 521 F.3d 799, 803 (7th Cir. 2008) ("A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated."). As an initial matter, it is unclear why the VE chose DOT code 379.367-010 in describing plaintiff's past casino job, rather than code 343.367-014, which appears to more accurately describe that position. As

15

indicated, code 343.367-014 refers to a skilled job, which would exceed plaintiff's RFC for simple, routine work. At the very least, this would appear to be a composite job situation; accordingly, the ALJ could not simply select the less demanding of the two codes (379.367-010), find that plaintiff could perform that variant, and deny the claim at step four on the "as generally performed" prong.

Nor does the VE's testimony provide a basis for finding that plaintiff could perform the casino job as he did it. While the VE discussed his experience watching and talking to people in casinos, he provided no description of the job duties. Further, given the VE's final exchange with the ALJ, quoted above, it appears that the VE relied on the DOT description of this job in opining that plaintiff could still perform it. Finally, the ALJ's decision includes no specific discussion of the requirements of this job, coupled with a finding that plaintiff could perform those tasks. See Nolen, 939 F.2d at 519.[10]

---

[10] The Commissioner contends that, even if the ALJ erred in finding that plaintiff could do the job as generally performed, the decision should be upheld under the "as actually performed" prong. The Commissioner notes that an ALJ may rely on the testimony of a VE regarding the nature of a claimant's work as actually performed, even if that testimony contradicts the DOT, see Jens, 347 F.3d at 213, and that in this case the VE testified that a person like plaintiff could perform this job as plaintiff actually performed it. (Def.'s Br. at 9, citing Tr. at 88-89.) On the cited transcript pages, the VE testified: "The past work as a systems monitor could be performed." He did not specify whether he was talking about the job generally or as plaintiff did it. As discussed in the text, the VE appeared to rely on the DOT in rendering this opinion; at the very least, the basis for his opinion is unclear, requiring a remand. The Commissioner also contends that the ALJ was permitted to rely on the VE because his testimony was uncontradicted. (Def.'s Br. at 9-10, citing Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002).) While plaintiff did not at the hearing make the precise argument he does now, his counsel did note that DOT code 379.367-010 applied to a government job at a transit terminal, rather than a private sector job in a casino. Counsel also questioned the VE regarding his basis of knowledge regarding casino monitors. This was sufficient to alert the ALJ to the issue. See Combs, 2017 U.S. Dist. LEXIS 98104, at *16; McDowell v. Berryhill, No. 15-cv-01477, 2017 U.S. Dist. LEXIS 33014, at *15-16 (S.D. Ind. Feb. 8, 2017), adopted, 2017 U.S. Dist. LEXIS 31968 (S.D. Ind. Mar. 7, 2017).

The step four error cannot be dismissed as harmless based on the VE's identification of other jobs plaintiff could do, as it appears plaintiff would be deemed disabled at step five under the Grid. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.06. Accordingly, the matter must be remanded for a new step four determination, which may require the receipt of additional vocational evidence regarding the precise nature of plaintiff's past work in a casino.

## B.  Plaintiff's Other Assertions of Error

In determining RFC, the ALJ must consider the entire record, including the medical opinion evidence and the claimant's statements regarding the severity and limiting effects of his symptoms. See SSR 96-8p, 1996 SSR LEXIS 5, at *13-14. Opinions from a claimant's treating physicians are generally given more weight, as they are most familiar with the claimant's condition. See, e.g., Israel v. Colvin, 840 F.3d 432, 437 (7th Cir. 2016). Accordingly, the ALJ is required to give "good reasons" for discounting the opinion of a treating source. Id. The contrary opinion of a non-examining consultant does not, by itself, suffice as a justification for rejecting a treating source. Id.

In the present case, plaintiff's treating primary care physician, Dr. Grass, prepared a report endorsing significant limitations on plaintiff's ability to function, which would, if accepted, require a disability finding. However, the ALJ gave Dr. Grass's opinion limited weight because it appeared to be based "solely on [plaintiff's] subjective complaints"; the objective evidence was "relatively mild," and plaintiff's response to treatment had generally been good; and the doctor's recommendation of exercise conflicted with his opinions. (Tr. at 36.) The ALJ instead gave significant weight to the opinions of the agency reviewing consultants.

The ALJ did not explain the basis for his belief that Dr. Grass relied solely on plaintiff's subjective statements. See Ryan v. Commissioner of Social Security, 528 F.3d 1194, 1200 (9th

17

Cir. 2008) (holding that ALJ may not discount a report on this ground without evidence the doctor relied on subjective claims rather than clinical observations); see also Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000) (indicating that the court cannot evaluate whether ALJ properly rejected evidence unless the ALJ explains his reasoning). The report itself does not reference plaintiff's statements, and the record contains a significant amount of "objective" evidence, including MRI scans of plaintiff's neck and back showing disc protrusions (Tr. at 345, 438); treatment notes recording limited mobility, gait difficulties, and lack of balance (Tr. at 347, 441); and attempts at various methods of pain control, with varying degrees of success (E.g., Tr. at 351, 409, 439, 451, 466, 479, 565, 619-20, 625). The ALJ also failed to explain how Dr. Grass's recommendation of exercise conflicted with his opinions. See Carradine v. Barnhart, 360 F.3d 751, 755-56 (7th Cir. 2004) (finding that exercise, as recommended by doctors, did not contradict claim of disabling pain). The ALJ pointed to no evidence that Dr. Grass suggested plaintiff exercise for more than three hours per day or otherwise engage in activities inconsistent with the limitations in the report.[11] Ultimately, the ALJ rejected the opinion of the only examining source in favor of non-examining consultants, who rendered their opinions well before Dr. Grass.[12] The ALJ should revisit this determination on remand.

In evaluating the credibility of a claimant's statements, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce his symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5; SSR 96-7p,

---

[11] In her brief, the Commissioner attempts to bolster the ALJ's findings (Def.'s Br. at 8-9), but my review is limited to the rationale contained in the decision.

[12] The agency obtained a consultative psychological evaluation but not a physical evaluation; accordingly, Dr. Grass's report is the only opinion on plaintiff's physical condition from an examining source.

18

1996 SSR LEXIS 4, at *5. If the claimant has such an impairment, the ALJ must then evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. SSR 16-3p, 2016 SSR LEXIS 4, at *9; SSR 96-7p, 1996 SSR LEXIS 4, at *5-6. At this second step, "the absence of objective medical corroboration for a complainant's subjective accounts of pain does not permit an ALJ to disregard those accounts." Ghiselli v. Colvin, 837 F.3d 771, 777 (7th Cir. 2016). Rather, once the claimant has demonstrated the existence of an impairment that can reasonably be expected to produce the symptoms, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms based on the entire record, considering the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; other treatment or measures the claimant receives or uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *18-19; SSR 96-7p, 1996 SSR LEXIS 4, at *8.[13] The ALJ must then provide specific reasons for his credibility determination, supported by substantial evidence in the record. See, e.g., Israel, 840 F.3d at 441.

Here, the ALJ specifically discounted plaintiff's claims based on the "paucity of objective findings" and his "good responses to treatment." (Tr. at 36.) The ALJ did not specifically

---

[13] In 2016, the Commissioner issued an updated Ruling on symptom evaluation, which eliminates use of the term "credibility" and clarifies that "subjective symptom evaluation is not an examination of an individual's character." 2016 SSR LEXIS 4 , at *1. This "change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." Cole v. Colvin, 831 F.3d 411, 412 (7th Cir. 2016).

discuss other regulatory factors and, as noted, a claimant's testimony cannot be rejected just because it is not corroborated by the objective medical evidence.

Plaintiff also notes that the ALJ did not consider, as a positive credibility factor, his solid work history. (Tr. at 212-13.) The Seventh Circuit has noted that "a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." Hill v. Colvin, 807 F.3d 862, 868 (7th Cir. 2015) (internal quote marks omitted). The Commissioner responds that an ALJ need not articulate his consideration of every possible regulatory factor, see, e.g., Henke v. Astrue, 498 Fed Appx. 636, 640 n.3 (7th Cir. 2012), nor is he required to discuss every piece of evidence in the record, see, e.g., Sims v. Barnhart, 309 F.3d 424, 429 (7th Cir. 2002). It is unnecessary to decide whether this omission alone would require reversal; because the matter must be remanded for other reasons, the ALJ should on remand factor plaintiff's work history into his credibility analysis.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 14th day of September, 2017.

/s Lynn Adelman
LYNN ADELMAN
District Judge

20